IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLAIR KUBERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civ. 08-212 Erie |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of Social Security ("the Commissioner"), denying plaintiff Clair Kuberry's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383f. The parties have submitted cross-motions for summary judgment. (Docs. 18 and 22). For the reasons stated below, the Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## I. General Background

Mr. Kuberry protectively applied for DIB and SSI on August 26, 2004, alleging disability based on back and neck problems (R. 370). Plaintiff's date last insured for purposes of his DIB claim was March 31, 2008; thus, he had to establish that he was disabled on or before this date in order to be entitled to a period of disability and DIB. 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.101. His application was initially denied, and he requested a hearing.

Mr. Kuberry, represented by counsel, appeared and testified at an administrative hearing before an Administrative Law Judge ("ALJ") on March 7, 2006. (R. at 471-95). A vocational expert ("VE") also testified at the hearing. On July 28, 2006, the ALJ issued his decision denying DIB and SSI benefits and concluded that Mr. Kuberry was "not disabled" under the Act.

(R. at 370-83). Mr. Kuberry requested a review by the Appeals Council, which remanded the case to the ALJ for further consideration on July 25, 2007, due to Mr. Kuberry's submission of new and material evidence. (R. 388-90, 398-99). A supplemental hearing was held on October 11, 2007. (R. 496-525). The ALJ issued his decision on November 29, 2007, finding that Mr. Kuberry was not disabled under the Act. (R. 21-32). The Appeals Council denied Mr. Kuberry's request for review on May 27, 2008, (R. 8-10), thereby making the ALJ's decision the final decision of the Commissioner.

Following the Appeals Council action, Mr. Kuberry filed this action seeking judicial review of the ALJ's decision.

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); see also 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals for the Third Circuit sets forth the five-step procedure as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

The claimant carries the initial burden of demonstrating by medical evidence that he is unable to return to his previous employment due to a medically determinable impairment. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this burden, steps one through four described supra, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. Id.

### III. Factual History

Mr. Kuberry was born on February 27, 1967 and was 39 years old on the date of his hearing, making him a "younger individual" as defined by the regulations (R. 503); 20 C.F.R. §§ 404.1563, 416.963(c). He attended school through the ninth grade. (R. 53). He is married with no children, (R. 476-77) and has past work experience as a lumber mill worker. (R.120). He claims to have become disabled on June 17, 2002, due to back pain that began when he injured himself picking up a log when he was working at the saw mill. (R.131).

3

### A. Medical history

On June 25, 2002, Mr. Kuberry was seen by William Sonnenberg, M.D. for low back pain. ( R. 187-92). He complained of back pain with some radiation down the left leg and occasional brief radiation down the right leg. (R. 191). He had positive straight leg raising test on the left, no bladder or bowel dysfunction, no back deformity tenderness, and his reflexes were 2+ bilaterally. (R. 191). Dr. Sonnenberg ordered x-rays of the lumbar spine, which he found were normal and lacking in any evidence of spondylolysis or spondylolisthesis; as was an MRI, which showed normal disc spaces and vertebral bodies, normal thecal sac, joint spaces, and surrounding paraspinal soft tissues. (R. 336, 197). Dr. Sonnenberg treated him with medication, encouraged him to return to work on light duty on August 15, 2002, and recommended continued physical therapy. (R. 192)

In July and August of 2002, Mr. Kuberry was treated with physical therapy, after which he reported some mild relief and a decrease in spasms. (R. 183). On August 7, 2002 and August 14, 2002, his physical therapist noted that Mr. Kuberry's back "feels better today" and that there was positive improvement in the lower back. (R. 181). On August 30, 2002, Mr. Kuberry reported that physical therapy was helping him and that his back pain was better. (R. 188). Dr. Sonnenberg again encouraged him to return to work on light duty, to be increased to full duty at a later time; he also provided him with a medial excuse to that effect. (R. 188). He also prescribed physical therapy but Mr. Kuberry was noncompliant and never returned to physical therapy. (R. 194).

On April 15, 2004, Mr. Kuberry was seen by Wilfredo Lukban, M.D. for a consultative examination. Mr. Kuberry complained of low back pain radiating up to the thoracic spine and toward the trapezius muscle; he also complained that he suffered headaches that began six months before. (R. 201). He complained of shortness of breath on exertion. He admitted that he walked daily as a form of exercise, and that he had not seen a doctor for over two years, despite what he has said was almost daily pain. (R. 202).  Dr. Lukban noted a lack of leg swelling, wheezing or chest pain. (R. 201). Plaintiff had no clubbing or cyanosis, normal muscle strength

4

and tone, no erythema or swelling of the trapezious muscles. (R. 202). Dr. Lukban noted that Mr. Kuberry preferred using his left extremity and winced when palpated at the L-3 spine on the left side. (R. 202). As to back pain, Dr. Lukban noted a lack of abnormalities on physical examination, and as to MRIs or x-rays. (R. 203). Mr. Kuberry displayed a full and normal range of motion in essentially all areas; Dr. Kukban opined that there was no physical basis for the complaint of back pain. (R. 203). He further concluded that Mr. Kuberry's headaches were as a result of tension, and that there was no physical basis for any limitation of motion or for the wincing reaction when asked to do things. (R. 204). Therefore Dr. Lukban opined that Mr. Kuberry had no limitations on lifting, carrying, standing, walking, sitting, pushing, pulling, postural activities, or any other physical or environmental restrictions. (R. 204-05).

Between July 2004 and October 2005, Mr. Kuberry was treated by a general practitioner, John Balmer, D.O. (R. 219-32, 236-301). When examined on July 13, 2004, Mr. Kuberry's neck was symmetric, supple, and had full range of motion, with no nodes, spasm, swelling, or tenderness. (R. 224). He had a normal gait with no bilateral swelling of the thoracic or lumbar spine. (R. 225). The strength in both lower and upper extremities was normal and symmetric. (R. 225). On August 20, 2004, he complained of a sore throat, headache and back pain, and asked to be excused from his work as a laborer. (R. 222).

On October 28, 2004, x-rays and MRIs of the cervical lumbar spine were again normal, exhibiting no stenosis or disprotrusion. (R. 339-42). On November 12, 2004, Mr. Kuberry showed a normal gait, some tenderness of the trapezius regions, no swelling over the paravertebral region, no bilateral swelling of the thoracic or lumbar areas, and no tenderness of the spine. (R. 260).

On December 3, 2004, Dr. Balmer noted normal and symmetric strength in the upper and lower extremities; the neck was symmetric, supple, and had full range of motion with no nodes, spasm, swelling or tenderness. (R. 256). Mr. Kuberry had a normal gait, and some tenderness, but no swelling over the paravertebral region, no bilateral swelling of the thoracic or lumbar area, and no tenderness of the spine or at the SI joint bilaterally. (R. 256). Although physical

examination showed that there were no changes, Dr. Balmer prescribed a cane for daily use. (R. 256). He also noted that Mr. Kuberry failed to comply with physical therapy. (R. 272).

When examined on March 24, 2005, Mr. Kuberry had tenderness in the right trapezius with some spasm in the trapezius and paraspinals, as well as limited rotation, flexion, and extension. (R. 240). Progress notes indicate that Mr. Kuberry was struck by a lever on his snowblower three days earlier, despite his complaints that any activity caused severe back pain. ( R. 242).

On July 21, 2005, Mr. Kuberry had a limited range of motion in the head and neck, with no spasm palpated, and a tender left trapezius (R. 238). He exhibited some spasm in the lumbar paravertebral spine, and had normal and symmetric strength in the upper and lower extremities. (R. 238).

On October 3, 2005, an associate of Dr. Balmer, George Hochreiter, D.O., noted, after explaining that x-rays and MRIs had all been normal, that physical therapy had not been beneficial,[1] and that he was "not sure that we have much of anything to offer in the way of injection." (R. 290). A few weeks later, Mr. Kuberry had normal results on his x-rays of the cervical and lumbosacral spine. (R. 265, 267). His cervical discs appeared normal and there was no disc protrusion, no stenosis; the dimensions of the canal were normal as was the spinal cord. (R. 268). His lumbar discs appeared normal with no evidence of disprotrusion, dimensions of the spinal canal were normal with no stenosis, and his bones were normal. (R. 269).

Mr. Kuberry was examined by Rodney Bingham, M.D. on two occasions. On December 19, 2005, he noted Mr. Kuberry's normal MRI and x-ray results and found a range of motion of 80 degrees in the cervical spine. He also reported normal sensation, and a musculoskeletal examination showed only diffuse tenderness in the spinal region. (R. 329). On March 16, 2006,

---

[1] The ALJ noted that "this is not supported by the objective medical evidence as already discussed and that the claimant had been noncompliant with the more recently prescribed physical therapy." (R. 28).

Dr. Bingham noted a normal gait and station, although he walked with a cane. (R. 344). He also noted tenderness over the left thoracolumbar paraspinal muscles and flank (R. 344). Mr. Kuberry said that the trigger point injections provided "satisfactory relief." (R. 344).

On July 24, 2006, Dr. Bingham completed a medical source statement. He opined that Mr. Kuberry could occasionally lift or carry up to twenty pounds, could frequently lift or carry ten pounds, could stand or walk for at least two hours in an eight-hour workday, must alternate sitting and standing every fifteen minutes, with ten-to-fifteen minutes allowed for position change, was limited in pushing and pulling with the upper extremities, had occasional limitations to climbing, balancing, kneeling, crouching, crawling, and stooping, and occasional limitations to reaching, as well as frequent limitations to handling, fingering and feeling. (R. 422-23). Dr. Bingham stated that he was "unable to assess" Mr. Kuberry's ability to complete a full work-day or work-week. (R. 424).

On October 2, 2006, Dr. Daniel Muccio, M.D., a neurologist, conducted a consultative examination and opined that Mr. Kuberry's description of his right upper extremity pain was consistent with radiculopathy. (R. 460). He noted that MRIs of the thoracic and lumbar spine dated March 1, 2006 were normal, and also, the MRI of the cervical spine showed only mild disc bulging at C5-6 and C6-7, with no stenosis. (R. 460). Dr. Muccio told him that he had a normal-looking spine and that there was nothing more he could do for him. (R. 460, 465).

On February 1, 2007, Mr. Kuberry was examined by Brian Dalton, M.D., a neurologist. He noted that Mr. Kuberry was very resistant to relaxing, kept his neck very tense, and had a lot of guarding. (R. 465). He had normal neurologic strength, and muscle groups were symmetric and equal bilaterally; reflexes were +2/3, and likewise symmetric and equal bilaterally. (R. 465). Dr. Dalton was of the opinion that inactivity and guarding were the cause of Mr. Kuberry's symptoms, and also, that he did not need to use his cane. (R. 466). He suggested that Mr. Kuberry increase his mobilization, stop smoking, and engage in aqua therapy. (R. 466).

On July 2, 2007, Mr. Kuberry reported feeling fifty percent better as a result of an epidural injection six months prior. (R. 434). On August 2, 1007, an associate of Dr. Balmer

noted a decreased range of motion in the spine and head, as well as tenderness and asymmetry. (R. 430-31).

On November 10, 2007, Dr. Balmer completed a medical source statement. He opined that Mr. Kuberry could occasionally lift or carry less than ten pounds, could stand or walk for less than two hours in an eight-hour workday, could sit for two hours in an eight-hour workday, and must alternate sitting and standing every fifteen minutes, with ten to fifteen minutes off-task for each position change. (R. 467-68). He believed that Mr. Kuberry was limited in pushing and pulling in his upper and lower extremities, and could never engage in postural maneuvers; that he was occasionally limited in reaching and should limit his exposure to temperature extremes, noise, dust, vibration, humidity/wetness, and hazards. (R. 469). Dr. Balmer further opined that Mr. Kuberry was medically likely to call off work three days in a five day work week, was medically unable to complete a full work day in all five days of a work week, and would require twelve to fourteen breaks in an eight-hour work day. (R. 469-70).

### B. Plaintiff's testimony

Mr. Kuberry testified that he does not do any household chores because of pain in his back and neck, and his instability on his feet. (R. 508, 515). As a hobby he operates remote controlled gas cars. (R. 489) He explained that he suffers from muscle spasms in his low back, pain radiating into his legs, difficulty walking or standing longer than 15 to 20 minutes and estimated that he could only walk 50 to 75 feet because his legs go numb. (R. 483-85, 507, 514). He stated that he can sit for 15 to 20 minutes before his arm and legs become numb. (R. 485, 507, 514). He must constantly change positions throughout the day to relieve these problems, and lies down throughout the day for 5 to 10 minute periods. (R. 487). Furthermore, Mr. Kuberry explained that he suffers pain on the right side of his neck, which causes his right arm to tingle and grow numb; he also stated that the pain causes dizziness and migraine headaches. (R. 483, 505-506, 510). At the time of his last hearing, he was treating his migraine headaches with daily injections of Imitrex. (R. 511). He stated that he must lie down for 30 to 45 minutes after each injection because the medication completely numbs him. (R. 512). He also stated that he

8

experiences drowsiness and dizziness for an additional 4 to 5 hours afterwards. (R. 512). Mr. Kuberry explained that if he does not treat his migraine headaches with Imitrex before the headache reaches its peak, he will be bedridden for the day with pain and vision problems. (R. 512). He also receives pain relieving shots in his neck, lower back, and hips. (R. 484). He stated that the shots help for about two months and then, he experiences the same level of pain he was having previously. (R. 484). His medications cause the following side effects: dizziness, loss of appetite, shakiness, tiredness, nausea, and restlessness. (R. 487).

### C. The Vocational' Expert's testimony

The vocational expert ("VE") testified that Mr. Kuberry's past relevant work as a saw operator and stocker in a saw mill was heavy and semiskilled; as a maintenance man, medium and unskilled; as a furniture maker, medium to heavy and semiskilled; as a fiberglass painter, medium and semiskilled; and as a logger, heavy and semiskilled. (R. 490-91). The ALJ asked the VE to assume a hypothetical individual with the same vocational profile as Mr. Kuberry, who was capable of light exertional activity that does not require the operation of foot controls, and who was unable to engage in repeated bending at the waist to 90 degrees, and who could not climb, balance, crawl, kneel or squat as an integral part of the job. The VE testified that such a hypothetical individual would not be capable of performing plaintiff's past relevant work, because they all exceeded the light work level. However, such an individual could perform jobs which exist in significant numbers in the national economy, including surveillance system monitor, document preparer, and ticket checker. (R. 31). Should said worker be off task ten to 15 percent of the work day, for an extended period of time, the individual would not be able to do these jobs in the national economy. (R. 493).

## IV. ALJ's Decision

In summary, the ALJ found that based on Mr. Kuberry's exertional limitations and his age, education, and work experience, Mr. Kuberry is not under a "disability." (R. at 31-32.) The ALJ undertook the five-step sequential evaluation in determining that Mr. Kuberry was not

9

disabled. The ALJ made the following findings:

    (1) that Mr. Kuberry had not engaged in substantial gainful activity since June 17, 2002 (R. 23);

    (2) that Mr. Kuberry suffers from severe impairments: chronic neck and back pain with possible fibromyalgia, and headaches (R. 23);

    (3) that he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4 (R. 24);

    (4) although unable to perform any past relevant work, he retains the residual functional capacity to perform sedentary work which would allow him to sit or stand at his discretion, and would not involve the operation of foot controls, climbing, crawling, kneeling, balancing, or squatting, and no repeated bending at the waist of 90 degrees, and no constant gripping or manipulating with the right dominant arm. ( R. 24);

    (5) based on his RFC and the VE testimony, Mr. Kuberry was able to perform jobs that exist in significant numbers in the national economy (R. 30).

## V. Discussion

Mr. Kuberry argues that the ALJ erred in a number of ways. First, he argues that the ALJ did not properly consider the physical assessment by his treating physician; specifically, Dr. Bingham's assessment that his ability to stand and walk is limited to 2 hours in an 8 hour work day and that he would be "off task" due to necessary position changes for ten to 15 minutes per position change. This, he asserts, precludes competitive employment at all exertional levels as he would be off task approximately half of the work day. Mr. Kuberry argues that there is no medical evidence of record provided by a treating source to contradict Dr. Bingham's findings. He argues that the ALJ did not provide any explanation for disregarding such evidence, in violation of 20 C.F.R. § 404.1527, and also, the ALJ failed to give sufficient weight to the opinion of a treating physician. Mr. Kuberry also argues that the ALJ improperly rejected vocation expert testimony concerning his time off task and that the ALJ improperly acted as a vocational expert and substituted his own opinion in such a way as to be inconsistent with the opinions of treating medical providers. (R. 524).

We find that the record shows that the ALJ properly considered all of the medical evidence, including the various medical opinions, before he rendered his decision that Mr.

10

Kuberry was not disabled under the Act. We recognize that treating physicians' reports should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2). "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2); and Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Nevertheless, an ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

On the other hand, "[b]ecause non-examining sources do not have an examining or treating relationship with the claimant, the weight accorded to their opinions depends upon the degree to which they provide supporting explanations for their opinion." 20 C.F.R. §§ 404.1527, 416.927. To the extent the explanations are consistent with the other substantial evidence in the case, such opinions from non-treating sources are entitled to more weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). Finally, an ALJ is not bound by findings of a state agency medical or psychological consultant. 20 C.F.R. §§ 404.1527, 416.927.

An ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. Fargnoli, 247 F.3d at 37. When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983).

There was substantial evidence to support the ALJ's decision not to give controlling weight to Dr. Bingham's opinions. As we noted supra, Dr. Bingham only examined Mr.

11

Kuberry twice. The ALJ incorporated certain aspects of Dr. Bingham's RFC assessment into his own RFC assessment. He rejected the assertion that Mr. Kuberry would be off-task for more than six to eight minutes in a typical hour of employment, finding this was inconsistent with the record evidence. (R. 31).

We further note that the ALJ considered Mr. Kuberry's daily activities. Mr. Kuberry is able to dress, shower, make his bed, use utensils, telephones, and television remote controls, and occasionally cook. (R. 131, 162). His hobbies included radio-controlled airplanes, camping and fishing. (R. 163, 165). He also reported that he tries to walk every day. (R. 202).

Finally, the ALJ found that Mr. Kuberry's statements concerning the intensity, persistence and limiting effect of his symptoms were not entirely credible. ( R. 25-26). We find no error here. It is the responsibility of the ALJ to make credibility determinations. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). The ALJ's credibility determination is entitled to deference by this Court. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3rd Cir. 1983); Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The ALJ, as the finder of fact, can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. See Baerga v. Richardson, 500 F.2d 309, 312 (3rd Cir. 1974).

"If the ALJ determines that the claimant's subjective testimony is not fully credible, the ALJ is obligated to explain why. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir.2002) (quoting Burnett, 220 F.3d at 120). The ALJ may reject subjective complaints "if he affirmatively addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his conclusions in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). When the ALJ is faced with conflicting evidence, "he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000)(quotations and citations omitted). A district court need not defer to the ALJ's credibility determinations that are not supported by substantial evidence. Smith, 637 F.2d at 972; Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974). We find that there is substantial evidence to

support the ALJ's rejection of subjective complaints. For example, he noted:

> [t]he claimant appeared to be a healthy individual and despite his complaints of back pain, the musculoskeletal examination revealed only some tenderness in the spine at the sacroiliac joint. The claimant had full motor strength and was observed to walk with a normal gait. Te claimant was seen for follow-up examinations thereafter but despite the fact that he made no prior complaint of severe back or neck pain he then indicated that there were times he could not get out of bed due to back and neck ain, raising serious questions as to the claimant's credibility. Dr. Balmer declined to complete forms for the claimant for medical assistance stating that he had not adequately evaluated him for his complaints of back pain. After Dr. Balmer declined to complete the forms, the claimant returned to his office now complaining of back and right sided neck pain of three years duration, complaints unsubstantiated by the medical evidence in the record and, given the claimant's lack of consistency in his complaints of back and neck pain to Dr. Balmer, causes further questions as to his credibility. . . . The claimant complained of moderate pain at rest and severe pain with activity, as well as complaining of pain radiating to the right knee and parathesia, complaints which I note were not in evidence during or substantiated by any prior physical examinations. The claimant displayed no signs of distress during the examination and while there were some signs of tenderness in the lumbar and trapezius regions with spasm and diminished range of motion, the claimant's strength remained full and normal. . . .

( R. 27-28)

With regard to determining Mr. Kuberry's residual functional capacity the ALJ considered "all relevant evidence." Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett, 220 F.3d at 121). The ALJ incorporated certain aspects of Dr. Bingham's RFC assessment into his own RFC assessment, but correctly rejected any implication that Mr. Kuberry would be off task for more than six to eight minutes in a typical hour of employment. ( R. 31). We agree that such a finding would have been inconsistent with the record evidence, and find that the hypothetical question posed to the VE by plaintiff's counsel alleged additional limitations not supported by the record evidence. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Several treating physicians found that Mr. Kuberry could return to work and that there was no physical basis for his complaints. The medical tests and clinical findings bear that out. Nearly every x-ray and MRI was normal. Physical therapy, when undertaken, continued to improve his condition. Dr. Bingham and Balmer's opinions were directly contradicted by their own physical assessments which found no physical limitations or significant abnormalities. Drs. Muccio and Dalton, both neurologists, found no limitations like

those put forth by Drs. Balmer and Bingham. Thus, we conclude that the ALJ's residual functional capacity determination is not in error as it is supported by substantial evidence.

## VI. Conclusion

The ALJ did not err in rejecting or giving the appropriate amount of weight to the opinion of Mr. Kuberry's treating physicians. The ALJ's decision as a whole is supported by substantial evidence in the record. To that end, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The decision of the ALJ is affirmed.

An appropriate order will be entered.

_September 9, 2009_
Date

_Maurice B. Cohill, Jr._
Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:   counsel of record